IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUDY S. GONZALES,<br><br>                    Petitioner,<br><br>          vs.<br><br>DAVID DAVEY, Warden, California State Prison, Corcoran,[1]<br><br>                    Respondent. | No. 2:13-cv-01347-JKS<br><br>MEMORANDUM DECISION |

Rudy S. Gonzales, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Gonzales is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Corcoran State Prison.  Respondent has answered, and Gonzales has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On February 7, 2007, Gonzales and his co-defendant Lorenzo Alberto Godoy were charged with attempted premeditated murder (count 1), two counts of assault with a semiautomatic firearm (counts 2 and 3), residential robbery (count 4), burglary (count 5), and false imprisonment (count 6) after Gonzales threatened Antonio Paniagua with a knife and Godoy shot Raul Ramos several times during a quarrel fueled by drugs, guns, and money.  Gonzales was also charged with possession of a firearm by a person who had previously been convicted of a serious felony (count 7).  The information additionally alleged that the crimes had

---

[1]        David Davey is substituted for Connie Gipson as Warden, California State Prison, Corcoran.  FED. R. CIV. P. 25(d).

been committed in furtherance of a street gang and that Gonzales had previously served six prior

separate prison terms, had been convicted of two prior serious felonies, and had committed a

serious felony after being convicted of two prior serious felonies.

The defendants pled not guilty and were tried before a jury from June 17 to July 17,

2008. On direct appeal of his conviction, the California Court of Appeal described the following

events underlying the charges against Gonzales and the evidence presented at trial:

> Victim Raul Ramos, who sold drugs, began buying methamphetamine from
> defendant Godoy in 2006.  Godoy agreed to supply drugs to Ramos, who would in turn
> sell the drugs and repay Godoy.  Haplessly, Ramos fell behind on his payments and owed
> Godoy $4,000.  Godoy, in turn, owed his supplier, "Rick."
>
> Godoy and Rick threatened to shoot Ramos if he failed to pay off the debt.
> Ramos agreed to pay Godoy $2,000 and turned over the pink slip to his truck as collateral
> for the balance of the debt.
>
> Ramos met defendant Gonzales twice briefly.  At their first meeting, Gonzales
> told Ramos not to talk to his son.  At the second, Ramos had gone to pick up drugs from
> Gonzales's aunt's home and Gonzales, who had a knife, challenged Ramos to a fight.
>
> In December 2005 Antonio Paniagua moved in with Ramos to escape from drugs
> and gangs; Paniagua had been affiliated with the Sureño gang from Southern California.
> Previously, Paniagua had stayed with Gonzales.  Ramos referred to Paniagua as his
> "son."

> **The Incident**
> One evening in January 2007, Ramos was in his apartment with Paniagua and
> Paniagua's girlfriend, Amanda Ickes.[1]  The trio was taking drugs.  Gonzales's niece,
> Esperanza Ybarra, was in the kitchen and Ramos's wife was in the bedroom.

> > FN1.   At trial, Ickes was no longer Paniagua's girlfriend.  Ickes testified she did
> > not want to be a witness because "[t]hings happen to witnesses."

> Ramos' neighbor, Lucero Rangl, saw six or seven strange men outside the
> apartments.  Two men stood behind a tree on the sidewalk, two others stood at the end of
> the street behind two cars, and two more stood in front of Ramos's apartment.  There was
> another man "just kind of roaming around."  One man went to the back of the building
> just before Rangl heard gunshots.
>
> Paniagua, who had been smoking methamphetamine, stood on the apartment's
> patio as Godoy and Gonzales walked up.  Godoy put a gun to Paniagua's head and they
> told him to go inside.  Paniagua went inside looking frightened, sat on the couch, and

said people were after him.  Shortly afterward, Gonzales and Godoy entered the apartment. Gonzales wore a black trench coat; Godoy wore a hooded sweatshirt.

Gonzales rushed at Paniagua, pulled out a knife, and threatened him.  As Ramos stood up, Gonzales told everyone to sit down.  Gonzales asked Ramos, "and by the way where is my money, fool."  Gonzales also told Godoy to calm down.  One of the intruders took Paniagua's blue belt, which he wore to show he belonged to the Sureño gang.

Godoy told Ramos that Ramos owed him $2,000.  Ramos said, "no one tells me to sit down in my own house."  Godoy picked up Ramos's police scanner; Ramos told him to put the scanner back.  Ramos grabbed Godoy's hand, and Godoy shot him once in the abdomen.

After Godoy shot him, Ramos heard his wife cry out.  As Ramos went toward the bedroom, Godoy shot him multiple times.  Ramos asked Godoy, "[I]s that all you got?" and stated "[Y]ou're not man enough to kill me."

As he left, Godoy pointed the gun at Ickes' head.  Ickes believed this was a warning to her to be silent.  Paniagua dialed 911 and handed the phone to Ickes.  During the altercation, Paniagua's cell phone and Ramos's scanner disappeared.

After the shooting, one of the men Lucero Rangl had seen earlier ran past.  He looked at Rangl and made a gesture of zipping his mouth shut.  Rangl testified she was frightened for her family.  The day after the shooting, Rangl identified Godoy as a man she had seen outside the apartment the previous afternoon.

**The Aftermath**

Officers arrived at the apartment shortly after the 911 call.  Ramos told officers Godoy had shot him.

Ramos was transferred to the hospital, where he was treated for gunshot wounds to his abdomen.  His injuries included damage to his liver, right kidney, and intestines.  Doctors removed one bullet from his abdomen during a three-hour surgery.

An investigator with the district attorney's office interviewed Ramos during his hospital stay.  According to Ramos, Gonzales told him they needed to talk and told him to sit down.  Godoy came in and they talked about Ramos's debt to Rick.  Ramos said he had paid the debt and Godoy owed the rest to Rick.  Ramos asked Gonzales what he wanted to do about it.  Gonzales looked at Godoy and nodded his head, and Godoy pulled out a handgun from his coat and shot Ramos.[2]

> FN2.   During an interview with officers, Ramos described Gonzales as an "older Sureño, an OG [original gangster]."

Following his release from the hospital, Ramos entered federal protective custody. In 2000 Ramos had worked as a federal informant.  He again worked with authorities in 2007 for money and to obtain favorable treatment for his son.  During the trial, Ramos was in a safe house and had been off drugs for over a year.

Paniagua, arrested for a probation violation after the incident, spoke with police detectives.  In describing the shooting, Paniagua stated Godoy picked up Ramos's

scanner, Ramos protested, and Godoy shot Ramos in the upper thigh.  Several shots followed.  During the shooting, Gonzales held a knife, flicked open.

Paniagua entered a witness protection program.  He was arrested for domestic violence against Ickes a month after the shooting, sentenced to prison, and released in 2008.

Paniagua feared retaliation if he testified.  When Paniagua took the stand for his preliminary hearing testimony, Gonzales said in Spanish, "Remember your children."

**Subsequent Searches**

Two days after the shooting, officers searched Gonzales's house.  They discovered a .25 caliber, semiautomatic pistol hidden under a mattress.  The gun was loaded with two cartridges.  In Gonzales's bedroom they found Paniagua's cell phone and a loaded 12–gauge shotgun.  Officers also uncovered gang paraphernalia, including a photo of Gonzales garbed in blue and holding a shotgun draped in a blue bandana.

Officers searched Godoy's apartment shortly after the shooting.  They located shells for a 12–gauge shotgun and several .25–caliber bullets.  They found the stock to a shotgun that matched a shotgun found at Gonzales's home. Officers did not find any guns.  They found gang paraphernalia: photos of Godoy wearing gang clothing and making gang signs.

**Gang Testimony**

Gonzales spoke with a district attorney's investigator about potential prosecution witnesses.  He said with a smile that "it would be a lot of people to eliminate" and "that's kind of hard to do."  Gonzales also stated that the shooting was more personal than gang related.

The investigator testified that Gonzales "had gone through steps" to drop out of the Mexican Mafia and was believed to be writing a book about his experiences.  Gonzales was the intended victim of a jailhouse attack because of his dropping out of the gang and writing a book.

During examination by the prosecution, the investigator explained the Mexican Mafia is a gang operating in prisons.  Sureños are "soldiers" for the Mexican Mafia.  The investigator testified not every Sureño group is connected to the Mexican Mafia, and stated the plot against Gonzales involved Sureños who were not part of a local group.

**Physical Evidence**

The bullet removed from Ramos was from the .25–caliber pistol recovered from under Gonzales's mattress.  The pistol could hold eight cartridges in the magazine and one in the firing chamber.  The four cartridge cases recovered from the crime scene were consistent with tests from the pistol, but they did not show individual characteristics sufficient to make a positive identification.  The unfired cartridges and cartridge cases found in Godoy's apartment sported an incomplete head stamp indicating the manufacturer of the ammunition.  Gunshot residue was found on Godoy's hands.

**The Tale of the Kites**

Leandro Escarsega, a county jail inmate, served time in 2007 for possession of methamphetamine for sale. He knew Godoy as a friend and was associated with the Sureños. After speaking with Ramos's son, Raul Ramos, Jr., Escarsega decided Paniagua, a friend, was in danger because of the shooting. Escarsega took action, contacting Gonzales and telling him if he needed a favor Escarsega would help him. To convince Gonzales of his sincerity, Escarsega told him Paniagua owed him money.

As Escarsega and his cell mate cleaned outside the cells, Gonzales passed a secret note, in jail parlance a "kite," under his cell door. Escarsega's cell mate picked up the note and gave it to Escarsega once they returned to their cell. The kite, addressed to "Leo 410" (Escarsega's cell number), told him to find some people to say that Paniagua had a gun and was going to shoot Gonzales. Under Gonzales's scenario, the same gun shot Ramos. The kite also said "[Paniagua] is a rat anyways." Escarsega told Detective DeLao about the kite and the detective made a copy.

Escarsega received a second kite from Gonzales, addressed to "Squeaky," a friend of Escarsega. The kite contained a jail cell number and three dots underlined twice. The message asked Squeaky to testify that he put the gun under Gonzales's mattress. The kite also said, "[I]f I get found guilty I'm going to get life." After showing the kite to DeLao, Escarsega delivered the message to Squeaky.

Escarsega wrote a kite to Gonzales, stating: "I know you don't know me. If there is anything I can do for you, let me know . . . . I can get that cake you wanted. How much is that cake worth? How much will you pay if I deliver . . . the cake." Gonzales sent a reply kite stating: "If you want to work with me, then just name the price, how much can you get it for me, and how much do you want in return . . . let[']s work out the details and agree upon something."

While Godoy was in the booking area waiting to be transported to court, he began arguing with Paniagua, who was in a booking cell. Godoy said, "[T]hat guy is a punk, that's why I shot his dad."

**Detective DeLao's Testimony**

DeLao, a member of the gang violence suppression unit of the Woodland Police Department, testified about the Mexican Mafia and the Sureños. According to DeLao, gangs strive to maintain respect through fear and intimidation. The members protect and support one another, acting as lookouts during criminal activity.
DeLao testified he believed Godoy belonged to the Sureño gang. Godoy had gang tattoos on his chest, back, neck, and hands.

Gonzales, DeLao testified, dropped out of the Mexican Mafia, but was a veteran and gang mentor. Like Godoy, Gonzales sported numerous gang tattoos.

After the prosecution posed a hypothetical, DeLao testified the shooting benefited the Sureños by instilling fear. According to DeLao, one member's failure to collect a drug debt would discredit the entire gang. Independent drug dealers do not have a similar need to maintain their reputations. During cross-examination, DeLao testified an active Mexican Mafia member would not be interested in crimes such as the charged offenses.

**Defense Case**

 Gonzales testified he became involved in gangs after he moved to Brawley at age 12.  He became involved with the Mexican Mafia but dropped out in 1997.  After Gonzales left the gang, there were attempts on his life.

 Over the years, Gonzales spent time in prison for various crimes.  Gonzales, addicted to heroin, was arrested in 2005 and entered a drug rehabilitation program.  His drug use led to his having to leave the program.

 As to the current charges, Gonzales learned his son loaned Gonzales's tools to Paniagua.  To retrieve the tools, Gonzales asked Godoy to drive him to the apartment where Paniagua was staying.  Previously, Gonzales told Paniagua he would beat him up if he did not get the tools back.

 The pair drove to the apartment, where they talked to Paniagua about the tools.  They began arguing and, according to Gonzales, Godoy (aka "Cholo") and Paniagua began fighting.  Paniagua offered Gonzales an "eight ball" of methamphetamine and led the men to the apartment.  Inside, they found several people, including Ramos, who began talking to Godoy.

 According to Gonzales, he did not have a knife and did not carry knives.  Because he was on parole and probation, Gonzales did not want to be involved with guns or shooting.  Prior to the shooting, Gonzales did not know Godoy had a gun or intended to shoot Ramos.

 Gonzales, who was talking to Paniagua, heard a gunshot and then left.  Gonzales and Godoy ran to Godoy's van, which promptly ran out of gas.  They walked back to Gonzales's sister's house and drank that evening; Gonzales went home that night and got drunk the following day.

 Two days after the shooting, Godoy smoked methamphetamine and began acting paranoid.  Gonzales told Godoy's friend to take away Godoy's gun.  Gonzales hid the gun under his mattress until he could get rid of it.  Officers arrested the duo the same day.

 Gonzales admitted writing the kites addressed to Squeaky and Godoy, and responding to Escarsega's kite.  However, he denied writing the first kite.

 According to Gonzales, in the kite to Squeaky, he was not sure who had given him the gun and did not want his son charged with it.  Gonzales figured Squeaky "can just ride it."[3]

 FN3. The jury was unaware of the kite to Squeaky until Gonzales testified.

 Gonzales explained Godoy was "not the sharpest knife in the drawer," so in his kite to Godoy he was only telling him what actually happened.[4]  Gonzales believed Godoy intended to pursue an alibi defense. In the kite  Gonzales said: "I've been doing a whole lot of thinking and studying the law" and they "can't beat the charges, but we can fix it where we don't get life sentence, either one of us, but you have to listen to me and do what I say."  Gonzales told Godoy to say he took the gun away from Paniagua after Godoy gave Gonzales a ride to the apartment so that Gonzales could talk to Paniagua about some tools.

FN4.   Gonzales first brought up the kite to Godoy during direct examination

During cross-examination, Gonzales testified the mark on the kite to Godoy meant "Southerner," a mark Gonzales had tattooed near his eye.  In the kite, Gonzales referred to "a couple of girls who are going to help out, so don't trip."  He explained this referred to witnesses who were going to testify to "the way I perceived it from gathering whatever happened."  Gonzales asked Squeaky to help him avoid being "blamed for the gun."

Gonzales testified his reply to Escarsega referred to drugs he wanted Paniagua to bring to jail.

Gonzales, when asked about respect, stated "nobody would disrespect me."  Gonzales testified: "Whenever you become a member of the [Mexican] Mafia, you're held to higher esteem by everybody. . . .  And once you make it to the top, there's nobody that can touch you."

Godoy also testified.  He stated he had a problem with methamphetamine and had landed in juvenile hall and the Youth Authority.  While in custody at the Youth Authority, Godoy became a member of the Sureño gang.  Godoy knew Gonzales as a family member.

The day of the shooting, Gonzales asked Godoy for a ride to pick up his tools.  Before they left, they drank beer and Godoy used methamphetamine.  After they arrived at the apartment, Paniagua spoke to them from the back patio.

Paniagua, who was seated, pulled a gun from his pocket.  Godoy grabbed the gun from Paniagua and put it in his jacket pocket.  Paniagua offered to give Gonzales some drugs as security for the tools.

When they went inside, Godoy saw Ramos, whom he recognized as someone who owed Gonzales money for drugs.  After Godoy picked up a scanner from the table, Ramos grabbed him.  Godoy heard a gunshot from Paniagua's direction.  Godoy shot Ramos "less than six" times while Ramos was "standing right in front of" him.  As Godoy began to run, he heard more gunshots.

Godoy and Gonzales drove away in the van, which ran out of gas.  They walked home and began drinking.  When Godoy woke up the next morning, the gun was no longer in his pocket.

Godoy denied receiving a kite from Gonzales in jail but acknowledged many of the directions in the kite were consistent with his testimony.

*People v. Gonzales*, No. C060061, 2012 WL 420142, at *1-8 (Cal. Ct. App. Feb. 10, 2012).

At the conclusion of trial, the jury returned verdicts finding both defendants guilty of attempted murder with premeditation (count 1), assault with a firearm (counts 2 and 3), and false imprisonment (count 6).  The jury also found Gonzales guilty of possession of a firearm by a person who had previously been convicted of a serious felony (count 7).  The jury found the

defendants not guilty of robbery (count 4) or burglary (count 5).  The jury was deadlocked on the gang enhancements.  Because Gonzales waived his right to a jury trial on the prior conviction allegations, the court conducted a bench trial and found them true.  The court subsequently sentenced Gonzales to an aggregate term of 146 years to life imprisonment.[2]

Through counsel, Gonzales appealed his conviction, arguing that: 1) the court erred in sentencing him for both assault with a firearm and attempted murder; 2) evidence of gang membership should have been excluded; and 3) the admission of written communication between Gonzales and other inmates violated his constitutional rights and forced him to testify at trial.  On February 10, 2012, the Court of Appeal issued a reasoned, unpublished opinion affirming the judgment against Gonzales in its entirety.  *Gonzales*, 2012 WL 420142, at *12. Gonzales petitioned for review in the California Supreme Court, which was summarily denied on April 25, 2012.

Gonzales then filed in the state superior court a *pro se* petition for a writ of habeas corpus that alleged that his trial counsel was ineffective.  That petition was also summarily denied on February 22, 2013.  Gonzales then raised his ineffective assistance claims in habeas petitions to the state appellate and supreme courts, both of which were denied without comment on April 26, 2013, and September 11, 2013, respectively.

Gonzales timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on June 21, 2013.  He subsequently filed an Amended Petition, which is now before the undersigned judge and ripe for adjudication.

---

[2]      Co-defendant Godoy was sentenced to an aggregate imprisonment term of 27 years four months, plus 32 years to life.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Gonzales raises four grounds for relief.  In his first and third ground, Gonzales argues that the trial court's admission of the testimony about the kites violated *Massiah v. United States*, 377 U.S. 201 (1964) (holding that a defendant's Sixth Amendment right to counsel is violated when the government introduces statements deliberately elicited by a government agent from an indicted defendant outside the presence of defense counsel).  He also contends that the admission of "irrelevant and highly prejudicial gang evidence" deprived him of a fair trial.  Finally, Gonzales asserts in claim four that trial counsel rendered ineffective assistance.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the only decision on Simmons' collateral review claims was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.      _Massiah_ Claim (Grounds One and Three)

Gonzales first argues that the court's admission of the jail notes (referred to as "kites")

that he passed to Leandro Escarsega violated _Massiah_ because Escarsega was acting as a police

agent when he manipulated Gonzales into writing the incriminating notes.  The Court of Appeal

laid out the following facts underlying this claim:

> Defense counsel filed a motion in limine to exclude evidence of the kites as violating Gonzales's Sixth Amendment right to counsel.  The trial court held an Evidence Code section 402 hearing to determine the kites' admissibility.
>
> Leandro Escarsega testified he was in custody with Gonzales in 2007.  While in custody, Escarsega learned his friend Paniagua was in danger.  Escarsega exchanged kites with Gonzales. He gave the first kite to Detective DeLao, who made copies and returned the original.  DeLao told Escarsega to continue the correspondence.
>
> When Escarsega was asked if DeLao told him to keep doing what he was doing, Escarsega testified: "I told him I was going to keep doing it.  He has no authority over me whatsoever, I'm not working for him."  DeLao told Escarsega he was not DeLao's agent or informant.  After the first kite, DeLao did not tell Escarsega to recontact Gonzales.
>
> Escarsega exchanged three or four more kites with Gonzales and turned them over to DeLao.  Escarsega testified that contacting Gonzales was all his idea.
>
> In the first kite, Escarsega told Gonzales that he knew Paniagua and would be willing to help Gonzales with "anything."  Escarsega said, falsely, that Paniagua owed him money, but his intent was to set Gonzales up.  Escarsega knew Gonzales had been arrested in connection with the shooting of Ramos.
>
> Escarsega later attempted to record a conversation with Gonzales, using a recording device supplied by federal law enforcement.  DeLao met with Escarsega about three or four times.
>
> The trial court denied the motion to exclude the kites.  The court compared the situation to one in which officers direct an inmate to attempt to get information from a defendant.  The court concluded: "But this is a lot more like somebody approaching the police and saying, I've been doing a little investigation on my own and [the] police officer says . . . if you ever find something out, give me a call . . . .  [¶]  There was no testimony that Officer DeLao started setting up and directing things, we didn't hear any of that until we got to the federal agent, and that seems to be after these notes were passed."

_Gonzales_, 2012 WL 420142, at *11.

The Sixth Amendment right to counsel attaches when the government initiates adversarial proceedings against a defendant.  *See Maine v. Moulton*, 474 U.S. 159, 170 (1985).  At that point, a defendant has the right to "rely on his counsel as a 'medium' between himself and the government."  *United States v. Danielson*, 325 F.3d 1054, 1066 (9th Cir. 2003).  The Supreme Court has stated that this right prohibits the government from eliciting incriminating information from an indicted defendant, outside the presence of counsel.  *See Massiah*, 377 U.S. at 206 (holding that eliciting a defendant's incriminating statements through a government informant, in post-indictment proceedings, intruded upon the right to counsel and violated the Sixth Amendment).  As a result, any prejudicial information obtained under such circumstances must be suppressed.  *Id.* at 207.

To establish a *Massiah* violation, a defendant must demonstrate that: (1) the informant was acting as a government agent; (2) the informant deliberately elicited incriminating statements; and (3) the defendant was in custody and under an indictment without the presence of counsel at the time of the statements.  *See United States v. Henry*, 447 U.S. 264, 270.  The rule applies even when the defendant initiates the contact with the informant, if the state "knowingly circumvent[s] the accused's right to have counsel present."  *Moulton*, 474 U.S. at 176.

To determine whether an informant is acting as a government agent, a reviewing court should consider: (1) whether the inmate is "acting under instructions as a paid informant for the Government;" (2) whether the informant is "ostensibly no more than a fellow inmate" of the petitioner; and (3) whether the informant was in custody and under indictment" at the time he obtained the incriminating information.  *Henry*, 447 U.S. at 270.  The Ninth Circuit has held that an explicit agreement to compensate the informant, while relevant, is not necessary to a finding

that the informant acted as an agent of the state.  *Randolph v. California*, 380 F.3d 1133, 1144

(9th Cir. 2004).  "[I]t is the relationship between the informant and the State, not the

compensation the informant receives, that is the central and determinative issue."  *Id.* at 1144.

Finally, "[a] federal habeas court ruling on a *Massiah* claim must also give the state court

opinion the deference required by AEDPA."  *Fairbank v. Ayers*, 650 F.3d 1243, 1255-56 (9th

Cir. 2011)  (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 459-461 (1986)).

In this case, the Court of Appeal concluded that Gonzales failed to establish a *Messiah*

violation because Escarsega was not acting as an agent of the police when Gonzales wrote the

incriminating notes:

> [T]estimony at the hearing supports the trial court's determination that the kites were not sent at the behest of law enforcement, but on Escarsega's own initiative.  When DeLao told Escarsega to "keep doing what you [are] doing," Escarsega interpreted this to mean he should keep the communications going because failure to do so could make things "worse."
>
> DeLao did not instruct Escarsega to pen the first kite; Escarsega gave it to the detective after the fact.  Escarsega told DeLao he was going to keep sending kites, and he subsequently turned over the kites to the detective.  [L]aw enforcement did not instigate the communications, but simply read the missives. Escarsega was not acting at DeLao's direction.  As such, DeLao's reading of the kites written by Escarsega did not violate Gonzales's right to counsel.

*Gonzales*, 2012 WL 420142, at *12.

This determination is both reasonable and fully supported by the record.  There is no

evidence in the record that law enforcement or the prosecution had ever asked Escarsega to

solicit information from Gonzales.  Nor was Escarsega a paid informant.  Further, nothing in the

record demonstrates that the prosecution affirmatively requested that Escarsega obtain

incriminating statements from Gonzales or that Escarsega was acting under instruction from the

prosecutors in Gonzales' case.  Rather, it is undisputed that Escarsega contacted law enforcement himself.

While Escarsega might have subjectively hoped to obtain a benefit in exchange for providing the prosecution with evidence against Gonzales, that alone is not sufficient evidence of the requisite state involvement.  *See Hovey v. Ayers*, 458 F.3d 892, 917 (9th Cir. 2006) (stating that an informant's subjective belief that he might receive lenient treatment in exchange for information does not amount to a promise or deal by the government sufficient to make the informant a state agent); *see also Fairbank*, 650 F.3d at 1255-56 (no *Massiah* violation where defendant's statements to jailhouse informant, made after adversary judicial proceedings had commenced, were admitted at trial because informant was not acting at law enforcement's request, despite informant's subjective belief that he was).  As previously mentioned, the state court's finding is entitled to deference on habeas review.  *Fairbank*, 650 F.3d at 1255-56. Accordingly, Gonzales is not entitled to relief on his *Massiah* claim.[3]

B.    <u>Admission of Gang Testimony</u> (Ground Two)

Gonzales additionally contends that he was deprived of a fair trial by the trial court's admission of gang evidence that was irrelevant and highly prejudicial.  On direct appeal, the appellate court determined that, in line with the California Evidence Code and state case law, the trial court properly allowed the gang-related evidence:

---

[3]    Gonzales additionally avers that the erroneous admission of the kites forced him to testify at trial, in violation of his Fifth Amendment right against self-incrimination.  But because there was no error in the admission of the kites, "his subsequent testimony, even if partly in response to the admission of the kites, was not 'fruit of the poisonous tree.'"  *Gonzales*, 2012 WL 420142, at *12.

>Here, evidence of Gonzales's membership in the Mexican Mafia and Godoy's membership in the Sureños was relevant to explain the roles of each defendant in the crimes and to explain the fear and intimidation the two men provoked in various witnesses.
>
>The prosecution presented evidence of Gonzales's former gang membership in an effort to explain why he accompanied Godoy to recover Ramos's drug debt. As a veteran of the Mexican Mafia, Gonzales took the lead in confronting Ramos while Godoy held the gun. Gonzales nodded in approval prior to Godoy's firing the first shot. In addition, Gonzales's gang membership explained his insistence on recovering Ramos's drug debt.
>
>As for Godoy, his membership in the Sureños and the concomitant responsibility for upholding the gang's status provided motivation for his shooting of Ramos. Ramos's act of disrespecting Godoy, by not backing down, could reasonably be interpreted as disrespecting the gang and leading to Godoy's potentially lethal retaliation.
>
>The gang evidence explained the fear and intimidation of the witnesses to the shooting. During and after the shooting, the men threatened Ickes and Rangl. Ickes stated she did not want to be a witness because "[t]hings happen to witnesses." Ramos, Paniagua, and Ickes were reluctant to testify, necessitating introduction of their previous statements. Defendants' gang status provided a plausible explanation for the witnesses' desire to avoid testifying and for the variations in their recollection of events.

*Gonzales*, 2012 WL 420142, at *10.

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson*, 431 U.S. at 154; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Thus, this Court is bound by the state court's interpretation of California state law. *Bradshaw*, 546 U.S. at 76. Indeed, the state appellate court's ruling was not objectively unreasonable and is fully compatible with federal law. It is well settled that "[e]vidence of gang affiliation is admissible when it is relevant to a material issue in the case." *United States v. Takahashi*, 205 F.3d 1161, 1164 (citing *United States v. Abel*, 469 U.S. 45, 49

(1984)).  As the Court of Appeal persuasively explained, the evidence here was relevant for a number of reasons, none of which contravene federal law.  *See, e.g.*, *United States v. Hankey*, 203 F.3d 1160, 1171-73 (9th Cir. 2000) (gang affiliation evidence admissible to establish bias and coercion); *Windham v. Merkle*, 163 F.3d 1092, 1103-1104 (9th Cir. 1998) (gang evidence is admissible to demonstrate a defendant's motive for participating in the alleged crimes); *United States v. Santiago*, 46 F.3d 885, 890 (9th Cir. 1995) (gang-related testimony relating to the witnesses' fear of retaliation was admissible on the issue of credibility).

Moreover, even if the trial court erred in admitting the gang-related evidence, such claim is not cognizable on federal habeas review.  "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established federal law,' as laid out by the Supreme Court."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Id.*  Thus, even if the state appellate court erred in upholding the admission of gang evidence at trial, Gonzales would not be entitled to relief, since there is no clearly established Supreme Court law for the state appellate court to contravene.  *See id.*; *accord Pena v. Tilton*, 578 F. App'x 695, 695 (9th Cir. 2014) (rejecting habeas petitioner's due process claim based on the allegedly erroneous admission of gang evidence on the ground that "the Supreme Court has never issued a 'clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ'") (quoting *Holley*, 568 F.3d at 1101); *Nieto v. Lamarque*, 410 F. App'x 37, 40 (9th Cir. 2010) (refusing to issue a certificate of appealability

-16-

because "[t]here was no clearly established Supreme Court law that even repeated references to a defendant's gang affiliation can render his trial fundamentally unfair").  Accordingly, Gonzales cannot prevail on this claim in any event.

C.    <u>Ineffective Assistance of Counsel</u> (Ground Four)

Finally, Gonzales alleges that habeas relief is warranted because he received the ineffective assistance of counsel.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Gonzales must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

As an initial matter, the nature of Gonzales' claim is entirely unclear in his Petition, which states only that he challenges "the denial of counsel (IAC)." Under the Rules Governing Section 2254 Cases in the United States District Courts, a federal habeas "petition must: (1) specify all the grounds for relief available to the petitioner; [and] (2) state the facts supporting each ground." Rule 2(c)(1)-(2), Rules Governing Section 2254 Cases in the United States District Courts. Pleadings from *pro se* prisoners are meant to be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). "Despite this liberal construction, *pro se* petitioners are nevertheless bound by the most basic rules of procedure with respect to their pleadings." *Cortez v. Clark*, No. 10-cv-0147, 2011 WL 883019, at *11 (S.D. Cal. Mar. 14, 2011) (citing *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir.1987)). Because Gonzales fails to satisfy this basic rule, his claim must be denied on that ground. *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations unsupported by a statement of specific facts do not warrant habeas relief); *see also Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) ("the

petition is expected to state facts that point to a 'real possibility of constitutional error'" (citation omitted)); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

In his Traverse, Gonzales clarifies that he seeks relief based on his claim, raised to the state courts in a state habeas petition, that he was denied counsel within the meaning of *United States v. Cronic*, 466 U.S. 648, 658-59 (1984) (holding that where counsel's conduct is egregiously prejudicial, no showing that there is a reasonable probability that the outcome would have been different is required, and prejudice and ineffective assistance are presumed). According to Gonzales, trial counsel's failure to orally argue a motion for a new trial that Gonzales himself had written and filed constituted *Cronic* error.  But *Cronic* error is limited to the rare case where counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing."  *Id.* at 659.  Here, however, the state court had a reasonable basis to reject Gonzales' claim because no fair reading of the record leads to the conclusion that this was a *Cronic* case—that counsel performed in such a way that a complete breakdown in the adversarial process occurred, resulting in the constructive absence of counsel.  Rather, the record reflects that counsel merely declined to argue Gonzales' motion that was plainly without merit. Accordingly, even if this Court were to consider Gonzales' claim raised properly for the first time in the Traverse, *see Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (holding that reply is not the proper pleading to raise new arguments); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief."), Gonzales would not be entitled to relief on it.

## V. CONCLUSION AND ORDER

Gonzales is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 8, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge